ESSCO GEOMETRIC, doing business as Diversified Foam Products, Inc., a Missouri Corporation, Appellee,

v.

HARVARD INDUSTRIES, doing business as Harvard Interiors Manufacturing Co., Inc., a Delaware Corporation, Appellant.

ESSCO GEOMETRIC, doing business as Diversified Foam Products, Inc., a Missouri Corporation, Appellant,

v.

HARVARD INDUSTRIES, doing business as Harvard Interiors Manufacturing Co., Inc., a Delaware Corporation, Appellee.

Nos. 94–1601, 94–1753.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 17, 1994.

Decided Jan. 24, 1995.

Ann E. Buckley, St. Louis, MO, argued (Jay A. Summerville, on the brief), for appellant.

Mark G. Arnold, St. Louis, MO, argued (Thomas M. Dee, on the brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, BRIGHT, Senior Circuit Judge, and McMILLIAN, Circuit Judge.

BRIGHT, Senior Circuit Judge.

## I. INTRODUCTION

In this breach of contracts action, Essco Geometrics, Inc., d/b/a Diversified Foam Products (Diversified), a materials supplier, sought damages from Harvard Industries, Inc. (Harvard), a manufacturer of office chairs, for Harvard's failure to honor (1) a written contract for materials and (2) an oral contract for materials, both allegedly made with Diversified. On the written contract claim, a jury awarded $400,000 and the district court entered judgment for that amount for Diversified. The district court summarily rejected the oral contract claim as unenforceable under the Missouri statute of frauds, Mo.Ann.Stat. § 400.2–201(3)(b) (Vernon 1994). Defendant Harvard appeals the ad-verse judgment of $400,000. Plaintiff Diversified cross-appeals the summary dismissal of the oral contract claim. We affirm on both appeals.

Harvard raises these issues on appeal: (1) Diversified failed to make a submissible case that Harvard's purchasing agent, Michael Gray, had either actual or apparent authority to enter into a two-year, exclusive and non-cancelable requirements contract with Diversified; (2) even assuming Gray had either actual or apparent authority, because Gray did not have both types of authority, the district court erred in submitting both issues to the jury; (3) the district court erred in refusing Harvard's proposed Instruction No. C, which stated that an agent's own statement of authority is insufficient to establish that authority; and (4) the written agreement was too indefinite to be an enforceable contract.

Diversified in its cross-appeal contends that its evidence from Harvard's former sales manager acknowledging the oral contract took the claim outside the statute of frauds.

## II. BACKGROUND

We present the relevant facts in the light most favorable to the nonmoving party, as is required in reviewing a denial of a motion for judgment as a matter of law. *Thomure v. Phillips Furniture Co.*, 30 F.3d 1020, 1022 (8th Cir.1994).

Harvard produces several products, but most importantly for purposes of this appeal, it manufactures chairs, and sells those chairs both to private and public entities. Diversified sells foam used in the chairs manufactured by Harvard. For over thirty years, Diversified supplied a large portion of Harvard's foam needs.

Prior to 1988, Harvard usually subcontracted with only two foam suppliers, Diversified being one of them.

To determine which companies would supply its foam, Harvard would issue bid requests to several potential suppliers, detailing Harvard's needs for a particular chair contract. The bids submitted did not contractually bind either party, but usually de-

termined which two companies would have Harvard's business, what prices the suppliers would charge, and approximately the quantity sellers would deliver.

Once Harvard had locked-in its two suppliers for a given chair contract, it ordinarily issued cancelable purchase orders whenever it needed foam. The purchase orders contained standard terms and conditions, which stipulated that the agreement committed Harvard only to the quantities of foam found in that particular purchase order. Harvard's purchase orders always applied to a limited time period, usually requiring the supplier to deliver within a couple of weeks or months.

For over twenty years, Frank Best served as Harvard's purchasing manager. From the beginning of his tenure at Harvard, Best cultivated a close business relationship with Edsel Safron, the president of Diversified, ensuring a continuing business relationship between supplier and manufacturer. In 1987, it appeared that Harvard would win the 1988–1990 General Services Administration (GSA) "double shell" chair contract. Best again issued a request to Diversified for bids on Harvard's foam needs. After the bids came in and were reviewed, Harvard issued purchase orders to Diversified for some of the GSA chairs, but Harvard also issued purchase orders to American Excelsior and Dalco, foam suppliers in competition with Diversified.

In July 1988, Frank Best retired, and Michael Gray, the former purchasing agent, became the new purchasing manager for Harvard. JoAnn Ceresia became Harvard's new purchasing agent under Gray and became responsible for issuing purchase orders as Harvard's day-to-day needs demanded. In September 1988, Ed Kruske became Harvard's new president.

With this new management in place, Harvard began a program to cut costs and improve quality. This program became known as the "world class manufacturing plan." Pursuant to this plan, Harvard decided in late 1988 to offer Diversified, Dalco and American Excelsior each an opportunity to quote new prices for the remainder of Harvard's 1988–1990 GSA contract. Because American Excelsior quoted the lowest prices

and because JoAnn Ceresia desired to diminish Harvard's perennial reliance on Diversified foam, American Excelsior became the primary supplier of Harvard's foam needs for the remainder of that contract. Diversified, however, did not receive another purchase order from Harvard for over a year.

When Diversified first learned that it no longer would supply foam for the GSA contract, Edsel Safron immediately contacted Harvard's new president, Ed Kruske, and claimed he had an oral agreement with Frank Best, guaranteeing Diversified 70% of the foam business. Kruske asked Safron whether Safron had anything in writing supporting his claim. Safron did not.

In the ensuing months, and throughout most of 1989, Harvard accelerated the implementation of its new world class manufacturing plan. Three aspects of that program are of particular note. First, Harvard had committed itself to reducing its vendor base and to working more closely with its foam suppliers so as to make the entire process of foam manufacturing and delivery more efficient. A principal part of this effort resulted in the collaboration of Harvard's and American Excelsior's engineering departments to consolidate and standardize foam parts.

A second dimension to the world class manufacturing plan was quality control. Under this part of the program, Harvard began gathering information on how each vendor manufactured its foam products and how each controlled the quality of the products produced. Throughout late 1989 and early 1990, Harvard visited several foam manufacturing plants, sent surveys out to its suppliers requesting information on their particular quality control measures, and met internally through a committee of Harvard managers to formulate a plan of quality control—which presumably would be imposed on their primary vendor.

In the fall of 1989, Ed Kruske implemented the third facet to Harvard's world class manufacturing plan. In an effort to cut costs, Kruske issued two internal memoranda. The first, issued on October 26, 1989, directed that all purchase orders (production and non-production) be initialed by Kruske

prior to being sent out to a vendor. The second directive, issued on December 4, 1989, stipulated that all requisitions of fifty dollars or more have both the departmental manager's approval and Kruske's approval, unless an emergency arose. Michael Gray received both of these directives, but Harvard never notified anyone outside of the company that it had instituted these internal operating procedures.

At the same time that Harvard was implementing these reforms, it began requesting bids for its 1990–1992 GSA chair contract. JoAnn Ceresia was responsible for sending out the requests and sent them to Dalco and American Excelsior. She did not send one to Diversified, however. Michael Gray had elected not to participate in this bid request and did not know that Ceresia had not sent a request to Diversified.

When Edsel Safron learned that Harvard had cut Diversified out of the bidding process for this new GSA contract, he contacted Gray to discuss whether Diversified could get a chance to bid. Safron and Gray met four or five times in early September 1989. Ultimately, Gray allowed Safron to submit a bid for the 1990–1992 GSA contract, which he did on September 12th. Based on further discussion in late September and October, Gray orally agreed to give Diversified all of its foam business for the GSA contract, as well as all of its commercial contracts covering the same two-year period. At the time, Harvard's quality department had rejected hundreds of American Excelsior's foam products because of manufacturing defects. Diversified, on the other hand, had never presented a "quality" problem, and its bids for the GSA contract were significantly lower than American Excelsior's. Gray had informed Kruske of Diversified's superiority, and believed Kruske would ultimately approve of his decision to make Diversified Harvard's primary vendor. Nevertheless, Kruske did not become aware of the agreement with Diversified until May 1990.

Pursuant to this oral agreement and mindful of Kruske's admonition that Harvard would only honor written contracts, Diversified's president Safron wrote and delivered a letter to Gray on January 9, 1990. The letter addressed to Harvard stated in part:

We are with the understanding that our bids covers supplying the foam for the entire projectile 350,000 to 500,000 Double Shell office chairs as called for from 2/1/90 thru 1/31/92. Our pricing is to remain fixed throughout the stated time period.

We are with the further understanding that Harvard would prefer that the firm enjoying the Lions share of its foam business also supply the foam on a contract by contract basis, for its other chairs, such as; Himco, Ergo, Commercials, wheel chairs, etc.

In this regard, an agreement in principle exist[s] in which Diversified Foam Products will supply the foam for said chairs over the period of 2/1/90 thru 2/31/92 at fixed quoted prices.

I trust you will find these understandings in keeping with our recent conversation. An extra copy of this letter is provided for your signature and return.

Appellant's Add. at 3–4. Both Safron and Gray signified approval by each signing at the bottom of the letter. Both Safron and Gray testified at trial that they understood the letter to represent an exclusive multi-million dollar contract between Harvard and Diversified for all of Harvard's foam needs for all of its chairs for a two-year period.

Later Gray issued Diversified several purchase orders covering parts for the GSA contract. Although Gray made these requests on unofficial purchase order request forms, he later replaced them with standardized forms that circulated throughout Harvard's various departments. On January 12, 1990, three days after signing the letter, Gray took Kruske to visit both Diversified's and American Excelsior's plants to assess each company's quality control programs. On January 22, 1990, Harvard wrote its major suppliers requesting that they submit "quality program plans." The letter went to current and past (and potentially future) vendors.

In the ensuing months, Diversified received purchase orders for commercial and GSA contracts, delivered parts, and got paid. Additionally, representatives from Diversified periodically met with representatives

from Harvard to discuss ways to render Diversified's foam delivery more efficient. Despite these ongoing relations between Diversified and Harvard, Edsel Safron had become concerned by the receipt of what he believed was an abnormally low number of purchase orders. On April 3, 1990, Safron met with Gray to discuss his concerns. Gray explained that he was having some difficulties with his assistant JoAnn Ceresia, who had been misdirecting purchase order requests away from Diversified and towards American Excelsior. On May 7, 1990, after again explaining to Kruske the problems Harvard was having with American Excelsior's quality and the better prices that Diversified offered, Gray directed Ceresia to issue all future purchase orders to Diversified. Additionally, Gray wrote a letter to American Excelsior, cancelling all of its orders.

Kruske within days thereafter put a hold on Gray's purchase orders to Diversified. Soon thereafter, American Excelsior submitted a new bid, unsolicited by Gray, that offered marginally lower prices than Diversified's on the 1990–1992 GSA contract. Three weeks later, Kruske decided to make American Excelsior Harvard's new principal supplier. This lawsuit followed.

Diversified sought damages against Harvard for breach of both the alleged oral agreement for 1988–1990 and the alleged written agreement for 1990–1992. On Harvard's motion for summary judgment, the district court granted Harvard's motion as to the oral contract, ruling that it was barred by Missouri's statute of frauds, but permitted Diversified's other contract claim to proceed to trial. *Essco Geometrics, Inc. v. Harvard Industries, Inc.*, No. 90–1354c(6) (E.D.Mo. Sept. 30, 1993) (order and memorandum).

The district court rejected Harvard's motions for judgment as a matter of law, and as we have observed, the jury returned a plaintiff's verdict for $400,000. This appeal followed.

## III. DISCUSSION

### A. Submissibility on Actual or Apparent Authority

Harvard's principal contention on appeal is that the district court erred in denying Har-

vard's renewed motion for judgment as a matter of law. Harvard claims that Diversified failed to present sufficient evidence to support its theory that Gray had either actual or apparent authority to bind Harvard to an exclusive, non-cancelable requirements contract.

In reviewing the district court's denial of a motion for judgment as a matter of law, we must determine whether there is sufficient evidence to support a jury verdict. *Thomure v. Phillips Furniture Co.*, 30 F.3d 1020, 1022 (8th Cir.1994). In making that determination, this court must "(1) resolve direct factual conflicts in favor of the nonmovant; (2) assume as true all facts supporting the nonmovant which the evidence tended to prove; (3) give the nonmovant the benefit of all reasonable inferences; and (4) affirm the denial of the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn." *Grand Laboratories, Inc. v. Midcon Labs of Iowa*, 32 F.3d 1277, 1280 (8th Cir.1994). In other words, "[j]udgment as a matter of law is appropriate only when all of the evidence points one way and is 'susceptible of no reasonable inference sustaining the position of the nonmoving party.'" *McKnight ex rel. Ludwig v. Johnson Controls, Inc.*, 36 F.3d 1396, 1400 (8th Cir.1994) (quoting *White v. Pence*, 961 F.2d 776, 779 (8th Cir.1992)).

Keeping in mind these standards of review, and after carefully reviewing the record, we conclude that the district court did not err in denying Harvard's motion for judgment as a matter of law.

### 1. Actual Authority

Under Missouri law,[1] for an agent to have actual authority, he must establish that the principal has empowered him, either expressly or impliedly, to act on the principal's behalf. *Hyken v. Travelers Ins. Co.*, 678 S.W.2d 454, 457 (Mo.Ct.App.1984). The principal can expressly confer authority by telling his agent what to do or by knowingly acquiescing to the agent's actions. *Rosen-*

---

1. Neither party disputes the application of Missouri law to this diversity action.

*blum v. Jacks or Better of America West, Inc.,* 745 S.W.2d 754, 760 (Mo.Ct.App.1988). Implied authority flows from express authority, and "encompasses the power to act in ways reasonably necessary to accomplish the purpose for which express authority was granted." *Id.* Missouri case law suggests that custom and the relations of the parties establish the parameters of implied actual authority. *Barton v. Snellson,* 735 S.W.2d 160, 162 n. 2 (Mo.Ct.App.1987); *Molasky Enterprises, Inc. v. Carps, Inc.,* 615 S.W.2d 83, 87 (Mo.Ct.App.1981); *Dudley v. Dumont,* 526 S.W.2d 839, 844 (Mo.Ct.App.1975). Thus, evidence that an agent historically engaged in related conduct, without limitation, would be enough to support a jury question on the issue of actual authority.

After extensively reviewing the trial record, we conclude that the district court did not act erroneously in submitting the issue of actual authority to the jury and denying Harvard's motion for judgment as a matter of law.

### a. Gray's Implied Authority

■ As an initial matter, both sides agree that no job description outlined the nature of Gray's responsibilities, let alone the scope of his authority. Despite the lack of express authority, however, other documentary evidence and testimonial evidence supports Diversified's claim. First, Gray's own testimony bore on his authority to bind Harvard to the January 9th agreement, and under Missouri law, this testimony alone is enough to make a submissible case. *Sappington v. Miller,* 821 S.W.2d 901, 904 (Mo.Ct.App. 1992). On direct examination, Gray testified as follows:

Q. And did you perceive and were you acting, signing this in your—as part of your job as a purchasing manager of Harvard?

A. Yes.

. . . .

Q. Did you believe Ed Kruske was in favor of your decision to go with Diversified as of January 1990?

A. Yes.

. . . .

Q. Did you have any doubt in your mind at all about your authority to sign that document?

A. No.

Tr. at 1–385, 1–390. Moreover, on re-direct, Gray testified that while the decision to enter the January 9th agreement with Diversified was risky, particularly in light of Kruske's management style, it was Gray's decision to make and Gray's risk to take as purchasing manager for the company.

Second, Gray's October 1989 performance evaluation establishes Harvard's express intention that Gray continue to take a more active role in managing his department and work on further reducing costs. Given the express nature of this evaluation, made only three months before Gray signed the January 9th letter, it would appear that Gray's negotiations with Diversified and the ultimate signing of the agreement furthered the company's objectives. Although not as explicit as a job description, the performance evaluation established enough express authority that a reasonable jury could conclude that Gray acted pursuant to it. *See Barton,* 735 S.W.2d at 162 (defining implied actual authority as those "powers incidental and necessary to carry out the express authority"); *United Missouri Bank, N.A. v. Beard,* 877 S.W.2d 237, 241 (Mo.Ct.App.1994) (same).

A third evidentiary basis for Gray's actual authority is the custom and practice at Harvard and within the industry. Gray testified that he had observed for over fifteen or sixteen years Frank Best, Harvard's former purchasing manager, negotiate with vendors and ultimately select vendors who Best believed would benefit Harvard. Others similarly testified that purchasing managers within the industry customarily made unsupervised decisions as to who would be their company's suppliers.

Although an exclusive, non-cancelable requirements contract differs materially from a standard purchase order, the practical reality of Harvard's (and the rest of the industry's) GSA contracts suggests that when Harvard ultimately selects a vendor for its GSA contracts, that vendor will enjoy between 60%

and 70% of Harvard's foam needs for the duration of the one or two year contract. To be sure, cancelable purchase orders constitute the daily and weekly routine, and usually Harvard will use more than one vendor. Nevertheless, cancellations have been few and far between, and with Harvard's new world class manufacturing plan, primary vendors have become exclusive vendors as Harvard seeks to cut down its vendor base. In fact, Brian McGuire, the St. Louis branch manager for American Excelsior, testified on cross-examination that American Excelsior was Harvard's exclusive foam supplier at the time of the trial.

Harvard maintains that its company's actions and its internal operating procedures in the weeks surrounding the signing of the January 9th letter negate any inference that Michael Gray had the authority to bind Harvard to an exclusive, non-cancelable requirements contract. We address these arguments.

### b. Harvard's Express Limitations

■ As noted above, Harvard had never explicitly authorized Gray to bind the company to an exclusive, non-cancelable requirements contract. Harvard asserts that it had in fact explicitly limited, not impliedly expanded, that authority. Harvard bases this contention on two internal Harvard memoranda, issued months before January 9th, which stipulated that every purchase order and every requisition over fifty dollars required Ed Kruske's approval. Because the January 9th letter purportedly bound Harvard to millions of dollars of purchases and because the evidence unequivocally demonstrated that Gray never notified Kruske of the letter before signing it, Harvard contends that no one could reasonably believe that Gray had acted within the scope of his authority. Moreover, that Gray usually complied with Kruske's directives further suggests that when he did not comply, Gray knew he was acting beyond his authority.

To counteract Harvard's contention that Gray violated the very *letter* of Kruske's directives, Diversified paints a very different picture, suggesting that Gray had fully complied with the *spirit* of these mandates. According to Gray's own testimony, Kruske's directives were a mere formality. Kruske never refused to sign-off on a requisition or purchase order and the directives themselves did not explicitly limit Gray's authority to negotiate and enter into contracts. As for signing the January 9th agreement, Gray testified that he did not need Kruske's approval because Kruske would ultimately have to sign-off on purchase orders issued pursuant to the agreement.

Evidence about Harvard's world class manufacturing plan strongly suggested that Kruske had issued these directives because he wanted to cut costs and maintain high quality controls. A reasonable jury could thus conclude that Gray's decision to sign the letter fully comported with the purpose behind the directives. On January 9th, Diversified did have the cheapest prices and, if not the best quality foam, certainly foam of comparable quality to their competitors. Even Kruske, on cross-examination, acknowledged Diversified's superiority at the time.

Diversified also presented evidence which suggested that Gray's failure to have Kruske sign-off on the January 9th agreement was motivated not by a belief that he lacked the authority, but rather by problems he was having with Kruske's management style and with his assistant, JoAnn Ceresia. Marc Treppler, Harvard's former quality control manager, testified that Kruske would not give clear directions and would let his managers make decisions. Michael Gray testified that Kruske "could be led pretty easily." Tr. at 2–82. Meanwhile, JoAnn Ceresia admitted on cross-examination that she was having communication problems with Gray, her immediate supervisor, and was meeting regularly with Kruske to make her pitch for American Excelsior. The tension between Gray and Ceresia, the close working relationship between Ceresia and Kruske, and Kruske's pliability may explain why Gray chose to delay notifying Kruske of the January 9th agreement.

Gray ultimately believed that Kruske would agree to his decision to select Diversified. The price and the quality were right; it was just a matter of timing. The fact that Harvard repudiated Diversified's agreement,

726

stopped issuing purchase orders to Diversified, and began issuing purchasing orders to American Excelsior—all less than a month *after* receiving a fractionally lower bid from American Excelsior—suggests that Harvard wanted the cheaper foam, not that it had no contract with Diversified.

In sum, the evidence regarding the limitations Harvard placed on Gray's authority and inferences therefrom are conflicting. Reasonable jurors could disagree in their interpretations of the nature of those limitations. Thus, the district court did not err in submitting the issue of Diversified's actual authority claim to the jury.

## 2. Apparent Authority

■ Under Missouri law, apparent authority is created by the conduct of the principal which causes a third person reasonably to believe that the purported agent has the authority to act for the principal, and to reasonably and in good faith rely on the authority held out by the principal. *Beard,* 877 S.W.2d at 240; *Earl v. St. Louis University,* 875 S.W.2d 234, 238 (Mo.Ct.App.1994); *Mahoney v. Delaware McDonald's Corp.,* 770 F.2d 123, 126 (8th Cir.1985). An agent may have apparent authority to act even though as between himself and the principal, such authority has not been granted. *Hamilton Hauling, Inc. v. GAF Corp.,* 719 S.W.2d 841, 846 (Mo.Ct.App.1986). Apparent authority does not arise from the acts of the agent. *Beard,* 877 S.W.2d at 241.

There are essentially three ways to establish apparent authority. One way is by the principal expressly and directly telling a third person that a second person has authority to act on the principal's behalf. Missouri courts have also recognized two other methods of creating apparent authority—by prior acts and by position. *Earl,* 875 S.W.2d at 238; *Hamilton Hauling,* 719 S.W.2d at 847. As explained in *Earl,*

> If a principal allows an agent to occupy a position which, according to the ordinary habits of people in the locality, trade or profession, carries a particular kind of authority, then anyone dealing with the agent is justified in inferring that the agent has such an authority. The principal may also

create the appearance of authority by "prior acts." By allowing an agent to carry out prior similar transactions, a principal creates the appearance that the agent is authorized to carry out such acts subsequently.

875 S.W.2d at 238 (citing *Hamilton,* 719 S.W.2d at 847–48).

■ In the present case, a reasonable jury could conclude that Harvard created the appearance of authority through a combination of position and prior acts.

For over twenty years, Harvard had allowed its purchasing manager, Frank Best, to solicit bids from vendors, negotiate with vendors, and ultimately select vendors for Harvard's governmental and commercial contracts. For most of those years, Diversified provided a substantial amount of Harvard's foam needs. When Ed Kruske took over as president of Harvard and Michael Gray succeeded Best as Harvard's purchasing manager, no one ever advised Diversified that Harvard had instituted new internal operating procedures or that the purchasing manager would have less authority to negotiate on behalf of the company. Moreover, no one ever advised Diversified that Harvard would delay its vendor selection for the 1990–1992 GSA contract. The only information that Diversified did receive regarding a change in Harvard's method of operations was Ed Kruske's declaration in 1988 that Harvard would only honor *written* contracts.

Based on the prior relationship between Harvard and Diversified and other evidence, Diversified made out a submissible case of apparent authority. *Cf. Hamilton Hauling,* 719 S.W.2d at 844 (factually similar to the instant case, except that the third party knew that the principal had placed limitations on the purported agent's authority to act—thus no agency); *Earl,* 875 S.W.2d at 239 (employee did not know and had no reason to know that employer had curbed agent's authority—apparent authority existed).

■ While Harvard's previous purchasing managers never before had entered an exclusive, non-cancelable requirements contract, and Diversified knew that Harvard had

never before entered such a contract, several of Harvard's foam suppliers intimated that the industry custom presumed, without question, that the purchasing manager possessed the authority to bind the company. As to whether industry representatives would apply this same presumption to long-term, exclusive and non-cancelable requirements contracts, and not merely purchase orders, Safron testified that Diversified had entered exclusive oral agreements with some customers, covering all of their foam needs and further had received a single written purchase order with one company that extended over two years. As with actual authority, the evidence and inferences therefrom led to differing conclusions, and were matters for resolution by the jury.[2]

We add that because plaintiff made a submissible case on actual and apparent authority, the district court did not err in submitting instructions on either theory of liability.

### B. Refusal to Submit Instruction No. C

■ In reviewing claims of instructional error, we apply the rule that trial judges have a considerable measure of discretion in framing jury instructions and need not adopt the exact language proffered by the parties. *Farmland Industries v. Frazier–Parrott Commodities, Inc.*, 871 F.2d 1402, 1408 (8th Cir.1989). On the other hand, a party is entitled to an instruction reflecting that party's theory of the case if the instruction is legally correct and there is evidence to support it. *Federal Enterprises, Inc. v. Greyhound Leasing & Financial Corp.*, 786 F.2d 817, 820 (8th Cir.1986).

**2.** Harvard principally argues that Diversified should have been more suspicious of Gray's authority to negotiate such an agreement. Given the uniqueness of a long-range, exclusive and non-cancelable requirements contract, that Harvard visited Diversified's plant on January 12th to assess Diversified's quality control programs, and that Harvard sent Diversified a quality control survey on January 22nd, Diversified should have done more to investigate whether, in fact, Gray had the authority to sign the January 9th agreement.

Missouri law, however, imposes no duty on a third party to investigate a purported agent's authority if " 'a person of ordinary prudence, conversant with business usages and the nature of the particular business' " could reasonably

■ Here, Harvard's proposed Instruction No. C ambiguously characterizes Missouri law on the issue of an agent's ability to establish his own agency, and thus the district court did not err in refusing it.

Instruction No. C. provided that:

An agent's or employee's own statements to others concerning the scope of his authority are not sufficient to establish that he had the authority he claimed, and others are not entitled to rely on such statement.

Appellant's App., Vol. III at 854. Under Missouri law, an agent cannot establish his authority or the scope of his authority by out-of-court declarations. *American Multi–Cinema, Inc. v. Talayna's N.W., Inc.*, 848 S.W.2d 557 (Mo.Ct.App.1993); *Cameron Mut. Ins. Co. of Missouri v. Bouse*, 635 S.W.2d 488, 491 (Mo.Ct.App.1982). However, an agent can establish and define the scope of his actual authority through in-court or deposition testimony. *Sappington v. Miller*, 821 S.W.2d 901, 904 (Mo.Ct.App.1992); *Hood v. Millers' Mut. Ins. Ass'n*, 578 S.W.2d 605, 609 (Mo.Ct.App.1979). Of course, an agent cannot establish his *apparent* authority with either extrajudicial declarations or in-court testimony, because, as discussed above, *see supra* section III.A.2. apparent authority is created by the actions and statements of the principal, not the agent.

Because Harvard's proposed instruction fails to clarify the distinctions between extrajudicial and in-court statements and between actual and apparent authority, the district court did not err in excluding it.

believe that the agent had such authority. *Federal Enterprises, Inc. v. Greyhound Leasing & Financial Corp.*, 849 F.2d 1059, 1063 (8th Cir. 1988) (quoting *Erickson v. Civic Plaza Nat'l Bank of Kansas City*, 422 S.W.2d 373, 380 (Mo.Ct.App. 1967)) (additional quotation omitted). Here, the jury could consider it reasonable for Edsel Safron and Diversified to have assumed that (1) Gray could speak for Harvard; (2) that the terms of the contract, while unusual, did require commitments that Diversified had had with other buyers; and (3) that the visit to Diversified's plant on January 12th and the receipt of the quality survey on January 22nd were simply part of Harvard's ongoing world class manufacturing plan, and designed to ensure that Diversified had the capability to handle the account.

## C. Enforceability of the January 9, 1990 Letter

Harvard's final claim is that the district court erred in rejecting Harvard's contention that the January 9th letter was so indefinite that as a matter of law it could not constitute an enforceable requirements contract.[3] Harvard makes three arguments, discussed below.

■ Harvard first contends that the January 9th letter allegedly memorializing the contract did not state that Diversified would be its exclusive supplier. Because "exclusivity" is an essential element of any valid requirements contract, Harvard contends the district court should not have submitted Diversified's written contract claim to the jury. We disagree.

As defined by the Missouri Supreme Court, a "requirements contract" is "one in which one party promises to supply all the specific goods or services which the other party may need during a certain period at an agreed price, and the other party promises that he will obtain his required goods or services from the first party *exclusively.*" *Kirkwood–Easton Tire Co. v. St. Louis County*, 568 S.W.2d 267, 268 (Mo. en banc 1978) (emphasis added).

Although the January 9th letter did not expressly state that Diversified was to be Harvard's "exclusive" supplier, this court has previously noted that the UCC does not require certain particular words to enforce a requirements contract. *Koch Hydrocarbon Co. v. MDU Resources, Inc.*, 988 F.2d 1529, 1541 (8th Cir.1993). Additionally, we have applied Missouri law in upholding an oral requirements contract where extrinsic evidence suggested that "exclusivity" was intended. *See Universal Power Systems, Inc. v. Godfather's Pizza, Inc.*, 818 F.2d 667, 671 & n. 1 (8th Cir.1987) (contrasting the instant contract to the alleged requirements contract in *Propane Indus., Inc. v. General Motors Corp.*, 429 F.Supp. 214, 220–21 (W.D.Mo. 1977), where there was *no evidence* of any express or implied promise of exclusivity).

In this case, the entire trial revolved around the presumption that the January 9th letter was an exclusive agreement, and Diversified's evidence substantially supported this presumption. The letter itself established that Diversified would provide the "Lion[']s share" of Harvard's foam needs and foam for the "entire [GSA] project[ ]." Additionally, Diversified's testimonial evidence strongly suggested that both Edsel Safron and Michael Gray understood their agreement to be an exclusive arrangement.

■ Harvard next contends that (even assuming the January 9th letter satisfied the "exclusivity" requirement) because the letter in question fails to specify quantity and a mechanism for determining price, the district court should not have permitted the jury to consider the letter as evidencing an enforceable requirements contract. We disagree.

Under Missouri law, "[t]he formation of a contract does not require that all terms be settled. One or more of the terms may be left open and the agreement will not fail for indefiniteness; but the parties must intend to make a contract," *Computer Network, Ltd. v. Purcell Tire & Rubber Co.*, 747 S.W.2d 669, 674 (Mo.Ct.App.1988) (discussing quantity and price terms), and "there [must be] a reasonably certain basis for giving an appropriate remedy." Mo.Ann.Stat. § 400.2–204(3) (Vernon 1994). Therefore, even assuming Safron and Gray had not settled upon the quantity and price terms of the January 9th agreement, if extrinsic evidence suggests that they intended to bind each other to an exclusive, non-cancelable requirements contract, and based on that evidence the district court could ascertain the extent of each parties' liability, the agreement would be enforceable. *Id; Dierker Associates, D.C., P.C. v. Gillis*, 859 S.W.2d 737, 743 (Mo.Ct.App. 1993).

The January 9th letter, as shown by extrinsic evidence, contains all the material and essential terms for a binding agreement. The January 9th letter provides that Diversi-

---

**3.** Harvard raised this claim in both of its motions for judgment as a matter of law. Thus, we will assume all facts supporting the nonmovant which the evidence tended to prove, and we will review questions of state law de novo. *Ruwitch v. William Penn Life Assur. Co.*, 966 F.2d 1234, 1236 (8th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 331, 121 L.Ed.2d 249 (1992).

fied would supply the "foam for ... 350,000 to 500,000 Double Shell office chairs as called for from 2/1/90 thru 1/31/92." It additionally stipulates that Diversified would "supply the foam ... for [Harvard's] other [commercial] chairs." As for the pricing, it would "remain fixed throughout the stated time period ... at fixed quoted prices." Although these terms are facially incomplete and ambiguous, Diversified presented both documentary and testimonial evidence establishing that Gray and Safron had agreed on quantity and price for GSA and commercial chairs and that they had intended to be bound by their agreement. Finally, we note that even if some latent ambiguities remained, requirements contracts are, by definition, usually ambiguous as to quantity and price.[4]

We conclude that there existed substantial evidence that, at the time the agreement was executed, the parties had agreed on a price and on quantity—to be based on other documents that showed what the prices and quantity would be.

### D. Oral Contract Claim

■ On cross-appeal, Diversified claims that the district court erred in granting Harvard's motion for summary judgment on the oral contract claim. On appeal from a summary judgment motion, we review the district court's grant of summary judgment de novo, applying the same standard the district court applied to the motion. *Thomure v. Phillips Furniture Co.*, 30 F.3d 1020, 1026 (8th Cir.1994). We will affirm if we conclude there are no genuine issues of material fact and Harvard is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

Diversified claims that Frank Best, Harvard's former purchasing manager, orally promised Diversified that it could supply 70% of Harvard's foam needs for the 1988–1990 GSA contract. Diversified seeks to bring this alleged oral promise within an exception

to the Uniform Commercial Code's Statute of Frauds, Mo.Ann.Stat. § 400.2–201(3)(b) (Vernon 1994), which provides:

A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable ...

(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made....

*Id.* Diversified claims that because Frank Best testified at his deposition that he entered into an oral contract with Diversified, the contract is enforceable as an exception to the statute of frauds.

The district court denied Diversified's motion, concluding that it was "unwilling to construe the statements of a former employee [of the defendant] testifying for the plaintiff as a judicial admission by the defendant." *Essco Geometrics, Inc.*, No. 90–1354c(6), at 4 (memorandum) (citing *Miller v. Sirloin Stockade*, 224 Kan. 32, 578 P.2d 247, 249 (1978)).

This is an issue of first impression for both Missouri and the Eighth Circuit. The very language of § 400.2–201(3)(b) supports the district court's conclusion. For § 400.2–201(3)(b) to apply, a "party" must admit under oath that a contract was made. Because Frank Best had retired at least two years before Diversified took his deposition, he cannot be deemed a "party" for purposes of § 400.2–201(3)(b). *Cf. United Acquisition Corp. v. Banque Paribas*, 631 F.Supp. 797, 810 (S.D.N.Y.1985); Mo.Ann.Stat. § 400.1–201(29) (defining "party" as including principals and agents, depending on the circumstances).

Despite the clarity of § 400.2–201(3)(b), Diversified contends that a § 400.2–201(3)(b) admission need not be a "judicial admission" to except it from the statute of frauds. Rather, a binding "evidentiary admission" would suffice. Borrowing from Federal Rule

---

4. Missouri's UCC requirements contract provision reads as follows:

A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

Mo.Ann.Stat. § 400.2–306(1). A requirements contract can contain quantity and price "estimates," and still be enforceable, provided that the actual amounts demanded are not unreasonably disproportionate to the estimates.

of Evidence 801(d)(2)(D),[5] Diversified suggests that because "evidentiary admissions" do not require that the declarant be an agent at the time of trial, Best's deposition testimony should satisfy the requirements of § 400.2–201(3)(b). This suggestion by Diversified lacks any merit.

Federal Rule of Evidence 801(d)(2)(D) defines non-hearsay. No one contends, however, that Frank Best's statements constituted "hearsay." He made those statements during his deposition testimony. Additionally, even assuming the principles of "evidentiary admissions" embodied in Rule 801(d)(2)(D) applied to § 400.2–201(3)(b), and we do not hold that they do, Frank Best's statements would not take the contract outside the statute of frauds. Regardless of the source of admissibility as evidence, the statement itself must have been made when the speaker was an agent of the party in order to avoid the bar to recovery imposed by the statute of frauds. Because Diversified does not seek to admit any statements made by Frank Best, other than those made during his deposition testimony when he was no longer employed by Harvard, Diversified's contention fails.

## IV. CONCLUSION

For the reasons stated above, we affirm on Harvard's appeal and Diversified's cross-appeal.

**5.** Rule 801(d)(2)(D) provides that "a statement by the party's agent ... concerning a matter within the scope of the agency ..., *made during the existence of the relationship*" is not hearsay. Fed.R.Evid. 801(d)(2)(D) (emphasis added).