_____

No. 96-3004
_____

Arkwright Mutual Insurance          *
Company, a Massachusetts            *
corporation; Insurance Company      *
of North America, a                 *
Pennsylvania corporation,           *
                                    *
         Plaintiffs - Appellants,   *
                                    *  Appeal from the United States
    v.                              *  District Court for the
                                    *  District of North Dakota.
Gwinner Oil, Inc., a North          *
Dakota corporation; Commonwealth    *
Petroleum Co., an Ohio              *
Corporation; Gwinner Propane        *
Inc., an Ohio corporation,          *
                                    *
         Defendants - Appellees.    *


_____

No. 96-3223
_____


Arkwright Mutual Insurance          *
Company, a Massachusetts            *
corporation; Insurance Company      *
of North America, a                 *
Pennsylvania corporation,           *
                                    *
         Plaintiffs - Appellees,    *
                                    *
    v.                              *
                                    *
Gwinner Oil, Inc., a North          *
Dakota corporation,                 *
                                    *

                  Defendant,              *
                                          *
Commonwealth Petroleum Co., an            *
Ohio corporation; Gwinner                 *
Propane, Inc., an Ohio                    *
corporation,                              *
                                          *
        Defendants - Appellants.*

                            _____

                            No. 96-3227
                            _____

Arkwright Mutual Insurance                *
Company, a Massachusetts                  *
corporation; Insurance Company            *
of North America, a                       *
Pennsylvania corporation,                 *
                                          *
        Plaintiffs - Appellees,           *
                                          *
     v.                                   *
                                          *
Gwinner Oil, Inc., a North                *
Dakota corporation,                       *
                                          *
        Defendant - Appellant,            *
                                          *
Commonwealth Petroleum Co., an            *
Ohio corporation; Gwinner                 *
Propane, Inc., an Ohio                    *
Corporation,                              *
                                          *
        Defendants.                       *

                            _____

                Submitted: June 9, 1997

                Filed: September 19, 1997
                            _____

                                -2-

Before MURPHY and HEANEY, Circuit Judges, and BOGUE,[*] District Judge.
_____

BOGUE, Senior District Judge.

This case arises out of an explosion and fire in Gwinner, North Dakota at The Melroe Company's manufacturing plant, on January 31, 1993. The plaintiffs, Arkwright Mutual Insurance Company and Insurance Company of North America were Melroe's property insurers at the time of the explosion. They brought this subrogation action in their own names against the defendants, Gwinner Oil Company and Gwinner Propane, Inc., for negligence in delivering liquid propane to their insured, Melroe. Defendant Commonwealth Petroleum Company is the parent company of Gwinner Propane and was named as a defendant for its alleged negligent training and supervision of Gwinner Propane's employees. The district court[1] entered judgment against the plaintiffs upon a jury verdict assessing more than 50% of the fault for the loss to Melroe. The plaintiffs appeal from that verdict and judgment asserting several points of error. We affirm.

I.

Melroe is a large industrial company which manufactures "Bobcat" skid steer loaders at its factory in Gwinner, North Dakota for shipment to customers worldwide. Melroe uses large amounts of liquid propane to heat its manufacturing facility and power its

_____

[*]The HONORABLE ANDREW W. BOGUE, United States District Judge for the District of South Dakota, sitting by designation.

[1]The Honorable Rodney S. Webb, Chief Judge, United States District Court for the District of North Dakota.

-3-

factory utility vehicles.  In fact, during the winter months, Melroe consumes approximately 30,000 gallons of propane per week.  At the time of the accident, Melroe was storing nearly 100,000 gallons of propane in a storage and delivery system located on its property.  This system consisted of five large tanks--four with 30,000 gallon capacities each, and one with a 15,000 gallon capacity.  These five containers were interconnected with a series of pipes called a "manifold" which enabled all of the containers to operate together as one storage system.  Each tank had its own shut-off valve, however, so that any one tank could be shut off or isolated from the rest of the system.  With all of the valves open, a properly manifolded system maintains a relatively equal level of propane in all of the tanks as the propane is consumed.  The liquid level in the tanks can vary widely, however, due to the peculiar properties of liquid propane.  As the temperature rises, liquid propane expands.  A small increase in temperature can cause a large volume expansion within the tanks.  If a tank is overfilled, and the propane then expands with an increase in temperature, hydrostatic pressure begins to build within the tank which, without some mechanism for releasing excess pressure, could become great enough to rupture the tank.  To prevent such an event, each of Melroe's tanks were equipped with two pressure relief valves designed to vent propane into the atmosphere if the pressure inside the tanks reached unusually high levels.  By regulation, all of the relief valves were required to be fitted with caps to prevent rain, snow, ice, etc. from blocking the vents and causing the valves to fail.

Melroe contracted with Gwinner Propane to supply its great demand for propane.  Because Gwinner Propane did not have a delivery truck large enough to transport the bulk propane required by Melroe, Gwinner Propane contracted with Gwinner Oil whereby Gwinner Oil used its fuel transporter to make propane deliveries

from Gwinner Propane's rail siding to Melroe's plant. Melroe's fuel was supplied on an "as needed" basis. Gwinner Propane's manager, Daniel Enderson, monitored Melroe's fuel levels and decided when to deliver propane, and in what amounts. Marshall Johnson drove Gwinner Oil's fuel transporter. Although he was an employee of Gwinner Oil, he took instructions from Enderson relative to the Melroe deliveries.

On January 25, 1993, at Enderson's direction, Marshall Johnson made another delivery of fuel to Melroe. Before pumping the nearly 9,000 gallons of propane into the manifold, Johnson noticed the 15,000 gallon tank was registering 97% full--a dangerously high level. Johnson called Enderson to report the overfull tank. Enderson instructed Johnson to close the shut-off valves to the 15,000 gallon tank, deliver the fuel to the system and reopen the valves to the tank. Johnson followed these instructions and the delivery was made without incident. Upon learning of the overfull tank, Enderson placed a telephone call to Melvin Adolfs, the maintenance foreman at Melroe, and informed him that the tank was registering 97% full. Adolfs in turn conveyed the information to Jerry Johnson, Melroe's maintenance coordinator, and to Mark Hardebeck, Melroe's maintenance worker in charge of the propane system. No one took measures to correct the problem. On January 27, Marshall Johnson returned to Melroe with another 9,000 gallons of propane. When he informed Enderson that the small tank was still 97% full, Enderson instructed him to follow the same delivery procedure as that of two days earlier. On January 29, Johnson was instructed to pump another 9,000 gallons of propane into the system following the same procedures, despite that the 15,000 gallon tank was still registering 97% full. After Enderson's initial call to Melroe regarding the overfull tank, no more calls were made to inform them the tank was still full. As of the January 29 delivery, no one had taken any measures to correct the problem.

By January 31, the outside temperatures had warmed from below zero to above freezing Fahrenheit. At about 6 a.m. on the morning of January 31, the 15,000 gallon tank ruptured and began releasing its contents. The ensuing explosion and fire caused nearly $2 million in damage to the Melroe plant and surrounding neighborhood. As Melroe's insurers, the plaintiffs bore the bulk of this loss.

At trial, the plaintiffs theory was that Marshall Johnson overfilled the tank, closed its shut-off valves, and left them closed for a week, thereby isolating the tank from the rest of the system. Moreover, because the rain caps were missing from the pressure relief vents, they became blocked with snow and ice preventing them from releasing excess pressure. The overfilled isolated tank, they argued, combined with a dramatic rise in temperatures, created tremendous hydrostatic pressure inside the tank which ultimately caused the tank to fail at pressure levels much higher than it was designed to withstand. The plaintiffs presented evidence to support their theory that the defendants knew the rain caps were missing, knew the tank was dangerously overfull, did nothing to alleviate the problem, and in fact, added fuel to an extremely dangerous manifold system. The plaintiffs maintained that the defendants' fault far exceeded that of Melroe's because the defendants breached their duty to either inspect Melroe's storage system or shut off the supply of propane once it obtained knowledge that the system was unsafe.

The defendants' theory, on the other hand, was that the tank failed as a result of a defective weld which, over time, weakened and burst at pressures much lower than 250 psi--the pressure at which the relief valves were calibrated to activate. The defendants disputed the plaintiffs' theory that the shut-off valves were closed and that the vent pipes were blocked by snow and ice. They presented expert testimony to support their theory that the

cracked weld caused the tank to become overfull.  The increased temperature, they argued, created pressure levels which, although lower than 250 psi, were higher than normal.  As the weakest point on the tank, the defective weld then failed under the pressure, allowing the propane to escape and ignite.  The defendants argued that Melroe's fault exceed their own because Melroe's storage tank and maintenance procedures did not comply with industry standards, thus allowing this accident to occur.

The jury was instructed to apportion fault among the various parties pursuant to North Dakota's comparative fault laws.  The jury returned a verdict assessing 54% fault to Melroe, 26% to Gwinner Propane and Commonwealth Petroleum,[2] and 20% to Gwinner Oil.

## II.

The plaintiffs first argue the district court erred in refusing to submit the plaintiffs' proposed jury instruction regarding a propane supplier's duty of care when delivering propane into customers' appliances that are known to be unsafe.  Failure to instruct on this duty, they maintain, erroneously allowed the defendant to characterize their duty as merely an allegation of negligence rather than an affirmative duty imposed by law. *See*, Monahan v. Flannery, 755 F.2d 678, 684 (8th Cir. 1985)(reversing a judgment based upon faulty instructions because it was "quite possible that the jury could have believed that the [legal duty] was, in fact not a specific duty by law, but, instead, merely an

---

[2]Gwinner Propane merged into Commonwealth Petroleum Company prior to trial and the jury was instructed to consider the negligence of both as if they were one entity.

allegation of negligence by plaintiffs"). The plaintiffs' proposed instruction No. 21 provides:

> The law imposes an affirmative duty upon a supplier of liquid propane to investigate once it receives reasonable notice of the existence of danger. Whenever a distributor or supplier of liquid propane is in possession of facts that would suggest to a person of ordinary care and prudence that a storage container or appliance of a customer is unsafe, the company has the duty to investigate, as a person of ordinary care and prudence similarly situated in handling a dangerous substance would do, before it continued to furnish additional liquid propane. The duty to exercise reasonable diligence to inspect or shut off the liquid propane supply is measured by the likelihood of the injury and only arises upon a reasonable notice of the existence of danger. The law does not measure the duty to exercise reasonable diligence by the customer's sophistication.

We review the district court's instructions to the jury for an abuse of discretion. Hoselton v. Metz Baking Co., 48 F.3d 1056 (8th Cir. 1995). De novo review applies, however, to the issue of whether the district court correctly interpreted state law. Kostelec v. State Farm and Cas. Co., 64 F.3d 1220 (8th Cir. 1995). It is well established that a party is entitled to have the jury instructed on its theories if the proposed instructions are correct statements of the law and supported by the evidence. Hoselton, 48 F.3d at 1063. The district court, however, is not bound to give the instruction requested by the litigants. Rather, the court has broad discretion in choosing the form and the language of the instructions. Essco Geometric v. Harvard Industries, 46 F.3d 718, 727 (8th Cir. 1995). There is no reversible error if the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and adequately submit the issues to the jury. Randle v. Parker, 48 F.3d 301, 304 (8th Cir. 1995). Initially, we must determine whether North Dakota has expressly delineated the legal duties owed by propane gas suppliers. The district court concluded it has not.

A.

The plaintiffs argue that North Dakota law "imposes a duty upon suppliers of propane to inspect and take affirmative action in the face of propane-related danger." They suggest that this duty arises from the National Fire Protection Association (NFPA) safety standards adopted by the North Dakota Fire Marshal pursuant to his authority under N.D.C.C. § 18-09-02 to make rules or regulations setting forth minimum general standards for the transport and utilization of liquified petroleum gases. NFPA standard 58, as adopted by the North Dakota Fire Marshal, provides in part that "[c]ontainers shall be filled only after determination that they comply with the design, fabrication, inspection, marking and requalifcation provisions of this standard." NFPA 58 § 4-2.2.3. The plaintiffs cite no authority nor does the Court's research reveal any authority wherein this provision of the safety standards has been interpreted by the North Dakota courts as imposing an affirmative duty upon a propane supplier to inspect its customers' appliances and take affirmative actions when it knows an appliance is unsafe. Indeed, the applicability of NFPA 58 was hotly contested at trial. The defendants called Mr. William Mahre to testify relative to NFPA 58's application. Mr. Mahre is a member of the National Propane Gas Association safety committee and is regularly involved in the interpretation and application of NFPA 58 for the propane industry and propane users. Mr. Mahre testified that in his opinion, § 4-2.2.3 did not apply to the defendants. In the face of the uncertainty surrounding its interpretation and application, the district court did not err in refusing to instruct on an affirmative duty arising out of NFPA 58.

B.

The plaintiffs also refer us to <u>Van Ornum v. Otter Tail Power Co.</u>, 210 N.W.2d 188 (N.D. 1973) for the proposition that the North Dakota Supreme Court has imposed a duty to take affirmative action in the face of a propane-related danger when the party knows about the danger and has the authority to reduce it. The plaintiffs, however, mischaracterize the holding of <u>Van Ornum</u>. In <u>Van Ornum</u> a construction worker was suffocated when he entered a sump room filled with propane gas in the basement of the new building his employer was constructing. One of the named defendants in the wrongful death action brought by the decedent's wife was the architect who designed the new building. The plaintiff alleged that the architect knew of the unsafe condition of the sump room but did nothing to halt the construction or alter the design plans to correct the problem. The plaintiff appealed the trial court's refusal to instruct the jury that the architect, as a matter of law, had authority under its contract with the building owners, to halt construction or take whatever measures were necessary to correct the known danger in the sump room. The court rejected the plaintiff's argument and merely held, *inter alia*, that the architect's authority under the contract was a question of fact for the jury, and the jury was properly instructed that if the architect indeed had such authority yet failed to exercise it in the face of a known danger, such failure to act *might* constitute negligence. <u>Id</u>. at 200-01. The <u>Van Ornum</u> case does not, as the plaintiffs argue, impose an affirmative duty upon the defendants to inspect and take action in the face of a known propane-related danger.

C.

Alternatively, the plaintiffs would have us rule that North Dakota would follow other jurisdictions which have addressed this issue and impose an affirmative duty on the part of a propane supplier to inspect the appliance or shut off the supply after obtaining notice that the storage appliance is unsafe. The plaintiffs rely substantially on <u>Simpson v. Skelly Oil Company</u>, 371 F.2d 563 (8th Cir. 1967) for the language of their proposed instruction number 21. In <u>Simpson</u>, a residential customer of the defendant oil company sued to recover damages from an explosion that occurred when the customer attempted to re-light the pilot on his propane burning water heater. There was evidence that the propane supplier inspected the water heater but failed to detect a gas leak in the system. Because the Iowa courts had not defined the duty of a gas distributor in Iowa to inspect or remedy defects after notice of a leak in appliances owned by its customers, the court relied in part on the cases of surrounding states regarding the question of the duty of a gas supplier. The court held that when a gas supplier is on notice of the unsafe condition of one of its residential customer's appliances, it has a duty to either inspect the appliance before furnishing additional gas, or shut off the gas supply entirely. <u>Id</u>. at 567-68. Importantly, however, in <u>Simpson</u> and the other cases relied upon by the plaintiffs, the courts imposed an affirmative duty to inspect or shut off the gas only in those situations where the defective appliance was owned by a residential customer of the supplier.[3] In the case at bar,

---

[3]*See*, <u>Gas Service Co. v. Helmers</u>, 179 F.2d 101 (8th Cir. 1950); <u>Bellefuil v. Wilmar Gas Co.</u>, 66 N.W.2d 779 (Minn. 1954); <u>Ambriz v. Pertolane</u>, 319 P.2d 1 (Cal. 1958); *and* <u>Weber v. Interstate Light and Power Co.</u>, 68 N.W.2d 39 (Wis. 1955).

In <u>Van Den Hul v. Baltic Farmers Elevator Co.</u>, 716 F.2d 504 (8th Cir. 1983) this court indicated that South Dakota would probably adopt the definition of a gas supplier's duty set out in <u>Simpson</u> where a propane supplier was on notice that the grain elevator's gas line was defective. There is no indication, however, that the elevator's propane system and consumption were vastly different from that of a residential customer.

-11-

Melroe had a maintenance crew of 20 workers, one of whom was specifically assigned to the propane storage system. Melroe was subject to a myriad of regulations relative to their tank farm and was responsible for training, maintenance, and the safe operation of their tanks. We cannot conclusively say that under these circumstances, the North Dakota court would impose an affirmative duty upon a gas supplier to inspect Melroe's tank farm or take measures, other than those taken by the defendants here, to correct the situation.

Because the plaintiffs' proposed instruction 21 does not accurately reflect the law of North Dakota, the district court did not err in refusing to give that specific instruction to the jury. Our ruling does not mean, as the plaintiffs suggest, that a supplier is free to disregard any dangerous situation and indiscriminately add propane to an unsafe system. It only means there is no specific duty imposed upon the defendants by North Dakota law. General negligence law, on the other hand, still applies. The suppliers in this situation are not relieved of their duty to act reasonably under the circumstances, nor of their liability for their failure to so act. We have reviewed the court's instructions in this case and find that, as a whole, they fairly and adequately presented the issues and the plaintiffs' theory to the jury.

III.

The plaintiffs next argue the district court erroneously admitted the opinions of two of the defendants' expert witnesses, Thomas Crane and John Brynildson. We review the district court's admission of expert testimony for an abuse of discretion. <u>Ventura v. Titan Sports, Inc.</u>, 65 F.3d 725 (8th Cir. 1995).

A.

Crane, a mechanical engineer, was called by the defendants to offer an opinion as to how the 15,000 gallon tank became 97% full and remained so throughout the week despite that the propane levels in the four other tanks were rising and falling uniformly. Crane's opinion was in part based upon a report by Philip Johnson prepared in connection with this accident. Johnson was an expert and consultant in the gas industry and a former employee of Crane's firm. Unfortunately, Mr. Johnson died before this case went to trial. The plaintiffs objected to any of Crane's testimony based upon his reliance on Johnson's report on grounds that it was not admissible under Fed. R. Evid. 703. Pursuant to Rule 703, an expert may rely on otherwise inadmissible hearsay evidence in forming his opinion if the facts and data upon which he relies are of a type reasonably relied upon by experts in his field. Fed. R. Evid. 703; <u>South Central Petroleum, Inc. v. Long Brothers Oil Co.</u>, 974 F.2d 1015, 1019 (8th Cir. 1992). Specifically, the plaintiffs objected to Crane's testimony on grounds that Crane never testified that Johnson's report was of the type reasonably relied upon by experts in his field. Our review of the record, however, reveals the district court made inquiry of Crane on this point and was satisfied that Johnson's report was of the type reasonably relied upon by experts in the field and that it was reasonably relied upon by Crane in forming his opinion. Moreover, as required by Rule

703, the district court expressly limited the admission to Crane's opinion and did not admit the substance of Johnson's report. South Central, 974 F.2d at 1019.

In any event, any error in the admission of testimony based upon Johnson's report would be harmless. Although Crane relied on Johnson's report in forming his opinion, this reliance was not exclusive. Where an expert's opinion is partly based on hearsay which does not meet the Rule 703 requirements, his opinion is nevertheless admissible if it is supported by the other independent bases upon which he relied to form that opinion. *See*, Simmons v. Chicago and Northwestern Transportation Co., 993 F.3d 1326 (8th Cir. 1993)(per curiam). Here the record shows that in addition to Johnson's report, Crane relied upon his own thorough understanding of the manifold system, his extensive experience in the behavior of propane, and his extensive investigation of the physical evidence, including the storage tanks, to arrive at his conclusions. We find that the district court did not abuse its discretion, and properly admitted Mr. Crane's expert testimony.

B.

The plaintiffs argue further that the district court erroneously admitted the expert testimony of John Brynildson, a metallurgist called by the defendants to testify regarding his opinion on the cause of the explosion. The plaintiffs maintain that Brynildson should not have been allowed to testify because his opinion was "pure speculation and totally lacked foundation." This argument goes to the weight rather than the admissibility of the expert's testimony. "[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the

opinion in cross-examination." Hose v. Chicago Northwestern Transportation Co., 70 F.3d 968, 974 (8th Cir. 1995)(citing Loudermill v. Dow Chemical Co., 863 F.2d 566, 570 (8th Cir. 1988)). Questions of an expert's credibility and the weight accorded to his testimony are ultimately for the trier of fact to determine. Fox v. Dannenberg, 906 F.2d 1253, 1256 (8th Cir. 1990). "Only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Hose, 70 F.3d at 974.

Here the district court made the threshold determination that Brynildson was competent to testify as an expert and that his testimony would assist the jury in determining a fact in issue. *See*, Fed. R. Evid. 702. Brynildson testified that in his opinion, the tank failed as a result of a growing "crack" in a defective weld within the tank. He also offered testimony to refute the plaintiffs' assertion that the tank failed at pressures greater than 250 psi. Brynildson based his opinion on his experience and knowledge as a metallurgist and on his extensive investigation and testing of the fractured tank. The plaintiffs greatly emphasize the fact that Brynildson testified although one would expect to find "beach marks" evidencing the type of growing crack which he opined was present in the 15,000 gallon tank, he found no such evidence during his examination of the tank. Thus, they argue, Brynildson's opinion regarding the existence of the crack was based on speculation and mere possibilities and should have been excluded. Brynildson also testified, however, that given the low quality of this particular weld, and the obliteration of the evidence caused by the explosion, it would be extremely difficult for anyone to find the characteristic beach marks. Moreover, beach marks (or the absence thereof) was not the only evidence upon which Brynildson based his opinion. Our review of the record reveals

that Brynildson's testimony was not without some basis in fact.  He was subjected to extensive cross-examination regarding his opinion and the jury was properly allowed to assess his credibility and the weight of his testimony.  The district court did not abuse its discretion in admitting Brynildson's expert testimony.

IV.

Finally, the plaintiffs argue that the district court erred in denying their motion for judgment as a matter of law, or alternatively, for a new trial on grounds that the jury's verdict was against the clear weight of the evidence.  We have thoroughly reviewed the record and find these asserted points of error are without merit.  Accordingly, the judgment of the district court is affirmed.[4]

A true copy

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[4]Insofar as it was brought only to preserve errors for resolution in the event the Court ordered a new trial, we do not reach the merits of the defendants' cross-appeal.